# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――

Argued January 18, 2008　　　　Decided June 10, 2008

No. 07-7054

JAMES E. GINGER, ET AL.,
APPELLANTS

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLEES

―――――

Appeal from the United States District Court
for the District of Columbia
(No. 03cv02512)

―――――

*David H. Shapiro* argued the cause for appellants. With him on the briefs were *Richard L. Swick* and *Ellen K. Renaud*.

*Donna M. Murasky*, Deputy Solicitor General, Office of Attorney General for the District of Columbia, argued the cause for appellees. With her on the briefs were *Linda J. Singer*, Attorney General at the time the brief was filed, and *Todd S. Kim*, Solicitor General. *Edward E. Schwab*, Deputy Attorney General, entered an appearance.

Before: SENTELLE, *Chief Judge*, GINSBURG, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GINSBURG.

GINSBURG, *Circuit Judge*: After the Metropolitan Police Department (MPD) reorganized its Canine Unit, eight police officers in the Unit sued the District of Columbia, claiming to be victims of racial discrimination and alleging several instances of retaliation for having filed a complaint. The district court granted summary judgment to the District, which we now affirm.

## I. Background

The MPD reorganized the Canine Unit in 2003. Before the reorganization, the Unit was divided into four squads, each of which worked four ten-hour shifts per week. Squads 1 and 2 worked the "midnight shift," from 8:00 p.m. to 6:00 a.m., and Squads 3 and 4 worked the "day shift," from 10:00 a.m. to 8:00 p.m. Squad 2 was composed of seven white officers and one black officer; those eight officers are the appellants. The other squads were roughly evenly divided between whites and non-whites.

Several years before the reorganization, Alfred Broadbent, then an assistant chief of the MPD, recommended the Department switch to a system in which the canine squads would rotate between day and night shifts; he was concerned that officers on a permanent midnight shift tended to become alienated from the Department. Broadbent's recommendation was not implemented, but he raised it again after the Department of Justice had pressured the MPD to adopt measures aimed at monitoring the use of force by the Canine Unit. In 2002, when Cathy Lanier became the Commander of the Special Operations Division of the MPD, of which the Canine Unit is a part, Broadbent urged her to reorganize the Unit from four permanent ten-hour shifts to five rotating eight-hour shifts.

At around the same time, Joshua Ederheimer, head of the Civil Rights and Force Investigations Division of the MPD, noticed that Canine Unit Squad 2 alone was the source of fully 11 of the 17 dog bites for which the entire Unit of four squads was responsible in 2002. In a deposition he said he was concerned about this imbalance, particularly upon realizing that "all but one of the officers on that squad were Caucasian and ... all of the people that had been bitten were African American." He told Lanier he was "very concerned about the racial makeup of the squad and that some kind of action had to be taken." He noted that the media and the Department of Justice might flag this disparity as indicative of a civil rights violation. Ederheimer also informed Charles Ramsey, the Chief of Police, of his concern. Ramsey said he would "do something" and would "talk to ... Lanier."

Duane Buethe, the supervisor of the Canine Unit, recounted at his deposition that he participated in a meeting with Lanier, Ederheimer, and other high-level officials of the MPD, in which the racial composition of Squad 2 was raised: "[A]fter we started talking about it and I looked at it and realized that the whole squad, with the exception of one officer, was white ... my first thought was this is not going to look good if it ever leaks out." He testified that Lanier said "oh, my, that's not going to look good" and "something's going to have to be done."

Shortly after that meeting, Lanier wrote a memorandum to Ederheimer stating in part that

> 11 out of 17 bites occurred with handlers in one Squad .... The squad involved in the majority of the bites has a racial make up [sic] that is predominantly white male ... in light of the information gleaned in this analysis, changes will be made ... in order to assign members with more K-9 experience equally throughout the tours of duty. The proposed reorganization of the squads must also take into

account the racial make up of those squads.

Ten days later Lanier announced the reorganization of the Canine Unit. As reorganized, there would be five squads, each of which would work five 8-hour shifts per week. One squad would work from 7:00 a.m. to 3:00 p.m., two from 3:00 p.m. to 11:00 p.m., and two from 11:00 p.m. to 7:00 a.m. The shifts would rotate every four weeks, thereby eliminating the permanent midnight shift. The eight members of Squad 2 were distributed among the five new squads.

Prophetically, Lanier noted in announcing the reorganization that "Change is never easy." According to Buethe, "Everybody [in the Unit] was upset. It was absolute turmoil." Several officers complained in their depositions about the inconvenience associated with the rotating schedule. In addition, because officers working overnight received a four percent pay differential, the members of old Squads 1 and 2 -- who no longer worked permanently at night -- lost pay.

All eight members of Squad 2 filed a complaint of racial discrimination with the EEOC. When the EEOC failed to take action, the officers filed suit in the district court, claiming they were victims of, *inter alia*, racial discrimination and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

The district court entered summary judgment for the District. 477 F. Supp. 2d 41 (2007). The court agreed with the officers that the reorganization had a sufficiently adverse effect to give them standing to complain about employment discrimination, *id.* at 50, but rejected that claim on its merits "because every officer in the Canine Unit was subjected to the reorganization." *Id.* at 49. The court also held the alleged instances of retaliation were either insufficiently serious to support a claim for retaliation or lacked evidentiary support. *Id.*

at 53-54.  The officers filed a timely appeal.

## II. Analysis

The officers contend the district court erred in granting summary judgment to the District on their discrimination claim because a reasonable jury could conclude the MPD reorganized the Canine Unit in order to ensure the squads were racially balanced.  They also renew their argument that various disciplinary actions and other incidents constituted retaliation for filing their complaints with the EEOC.  We review the judgment of the district court *de novo*.  *Salazar v. WMATA*, 401 F.3d 504, 507 (D.C. Cir. 2005).

## A. Discrimination

Title VII requires that "[a]ll personnel actions affecting employees ... of the Government of the District of Columbia ... shall be made free from any discrimination based on race."  42 U.S.C. § 2000e-16(a); *see also Borgo v. Goldin*, 204 F.3d 251, 255 n.5 (D.C. Cir. 2000) ("Title VII places the same restrictions on ... District of Columbia agencies as it does on private employers").  We analyze first whether the reorganization was a sufficiently adverse action to support a claim under Title VII; we then consider whether the officers have adduced sufficient evidence of racial discrimination to put their case before a jury.

## 1. Adverse action

An employment action does not support a claim of discrimination unless it has "materially adverse consequences affecting the terms, conditions, or privileges of [the plaintiff's] employment ... such that a reasonable trier of fact could find objectively tangible harm."  *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002).  Although "[p]urely subjective injuries, such as dissatisfaction with a reassignment ... are not adverse

actions, ... reassignment with significantly different responsibilities[] or a significant change in benefits generally indicates an adverse action." *Id.* at 1130-31 (internal quotation marks and ellipsis omitted).

The District challenges the district court's determination that the reorganization was an adverse employment action. It contends the reorganization was not adverse because it did not change the officers' responsibilities or cause a substantial change in their benefits.

We disagree. First, as the officers point out, they lost income as a result of the reorganization; because they worked fewer hours at night, they earned less of the pay differential for night work. A nontrivial loss of pay is an "objectively tangible harm." *See Russell v. Principi*, 257 F.3d 815, 818-19 (D.C. Cir. 2001) (performance evaluation that resulted in "loss of a bonus that is worth hundreds of dollars" an adverse employment action).

Second, the officers were considerably inconvenienced by the reorganization. They testified that switching to a rotating shift from a permanent shift severely affected their sleep schedules and made it more difficult for them to work overtime and part-time day jobs. As the officers convincingly argue, inconvenience resulting from a less favorable schedule can render an employment action "adverse" even if the employee's responsibilities and wages are left unchanged. *See Freedman v. MCI Telecomms. Corp.*, 255 F.3d 840, 844 (D.C. Cir. 2001) (holding transfer to night shift an adverse employment action because "the change in hours interfered with [the plaintiff's] education").

In sum, after the reorganization, the officers were paid less for working a substantially more difficult schedule. Clearly,

these harms are "objectively tangible," not "[p]urely subjective." *Forkkio*, 306 F.3d at 1130-31.

2. Causation

To evaluate a claim of racial discrimination under Title VII, we apply the analytical framework adopted by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 793 (1973), as restated and refined in *Texas Department of Community Affairs v. Burdine*:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the [adverse action]." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

450 U.S. 248, 252-53 (1981) (quoting *McDonnell Douglas*, 411 U.S. at 802-04). In this case, because the District has advanced several legitimate reasons for the reorganization, our concern is not with whether the officers have made out a prima facie case. Rather, the "central question" is whether the officers "produced sufficient evidence for a reasonable jury to find ... the employer intentionally discriminated against [them] on the basis of race." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

The district court entered summary judgment for the District on two grounds, neither of which withstands scrutiny. The first was that, because "every officer in the Canine Unit was subjected to the reorganization," no officer could claim

employment discrimination. 477 F. Supp. 2d at 49. In order to prove discrimination, however, a plaintiff need not demonstrate that "a similarly situated person outside [his] protected class [was] treated disparately." *Czekalski v. Peters*, 475 F.3d 360, 365-66 (D.C. Cir. 2007); *accord Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 851 (D.C. Cir. 2006) ("[W]e have expressly rejected as immaterial a requirement that the plaintiff be [treated differently from] an individual outside [his] protected class"); *George v. Leavitt*, 407 F.3d 405, 412-13 (D.C. Cir. 2005) (district court erred in holding plaintiff must show he "was treated differently than similarly situated employees"); *Stella v. Mineta*, 284 F.3d 135, 146 (D.C. Cir. 2002) (same).

The district court also opined, "The fact that concern about race relations plays into decision making at a macro level when developing policies on how to reorganize a police unit" does not render the reorganization discriminatory. 477 F. Supp. 2d at 49. We disagree: "[C]oncern about race relations," however important and legitimate a matter of policy it may be, does not, under Title VII, make it permissible for an employer to subject an employee to an adverse employment action because of his race. *See Taxman v. Bd. of Educ. of Twp. of Piscataway*, 91 F.3d 1547, 1563 (3d Cir. 1996) (en banc) (holding a "non-remedial affirmative action plan cannot form the basis for deviating from the antidiscrimination mandate of Title VII").

Nevertheless, we affirm the grant of summary judgment for the District. Although race may have played a role in the reorganization, we agree with the District that a reasonable jury could not conclude, as the officers contend, that the justifications for the reorganization proffered by the District were but pretexts for racial discrimination.

There are two ways of establishing liability in a Title VII case. A plaintiff may pursue a "single-motive case," in which he argues race (or another prohibited criterion) was the sole

reason for an adverse employment action and the employer's seemingly legitimate justifications are in fact pretextual. *See* 42 U.S.C. § 2000e-2(a)(1). Alternatively, he may bring a "mixed-motive case," in which he does not contest the *bona fides* of the employer's justifications but rather argues race was also a factor motivating the adverse action. *See* 42 U.S.C. § 2000e-2(m); *Fogg v. Gonzales*, 492 F.3d 447, 453 (D.C. Cir. 2007) (recognizing single-motive and mixed-motive theories as "alternative ways of establishing liability"). In a mixed-motive case, but not in a single-motive case, it is a partial affirmative defense that the employer would have taken the same action even "in the absence of the impermissible motivating factor"; in such a case the plaintiff is entitled only to a declaratory judgment, limited injunctive relief, and attorney's fees. 42 U.S.C. § 2000e-5(g)(2)(B); *Fogg*, 492 F.3d at 451, 453.

In this case the officers proffered evidence indicating race was a motivating factor behind the reorganization. As we have seen, both Ederheimer and Buethe testified that they participated in meetings with Lanier in which they each expressed the concern that an almost all-white squad was responsible for a disproportionate number of the dog bites caused by the entire Canine Unit, and shortly before the reorganization, Lanier wrote a memorandum to the same effect.

The officers might have had a compelling case had they argued race was one of multiple motivating factors behind the reorganization, but they did not. Rather, they brought a single-motive case: According to the officers, race was the sole reason for the reorganization, and the MPD's nondiscriminatory justifications were mere pretexts. That simply cannot be correct.

There were two aspects to the reorganization: The MPD changed the composition of the squads, and it replaced the permanent shifts with rotating shifts. The first aspect can be explained as racially motivated, i.e., to break up the nearly all-

white squad, but the second -- which was the aspect that adversely affected the officers and gave rise to this action -- cannot. If the sole motivation for the reorganization had been to ensure the squads were racially more balanced, then the MPD could simply have switched some white members of Squad 2 with non-white members of other squads. It took the more consequential steps, however, of changing the hours a shift would work and of rotating the squads through the various shifts -- steps entirely unrelated to the racial composition of the squads. The officers, however, adduced no evidence whatsoever of a causal link between race and those aspects of the reorganization.

In contrast, the District presented three legitimate justifications for changing the officers' schedules. Lanier testified that rotating the units would decrease the likelihood a single squad would be responsible for a majority of the dog bites, which occur disproportionately at night. She also said she wanted to add a new sergeant to the Canine Unit, which by itself necessitated some reorganization. Finally, Broadbent testified that he believed the permanent midnight shift was undesirable because the officers tended to become alienated from the department.

The officers contend those justifications were intended to cover up the MPD's true motivation, but their theory is not supported by the record. Recall that in her memorandum, Lanier flatly stated that "[t]he squad involved in the majority of the bites ... is predominantly white male" and that "[t]he proposed reorganization ... must ... take into account the racial make up of those squads." To conclude race was her sole motive for reorganizing the unit, therefore, one would have to believe Lanier would make a significant change in every officer's work schedule in order to cover up a motivation that could not be covered up; she had not only discussed her concern about race openly with other senior officials in the MPD but even

committed it to writing in an official document.  Recall, too, that Broadbent had proposed switching to a system of rotating shifts years before the racial composition of Squad 2 became a concern, which further weakens the officers' theory that the MPD's justification were a pretext for racial discrimination.  In sum, the officers never contended this was a mixed-motive case, and no reasonable jury could conclude the District's justifications were pretextual, leaving race as the sole motivation for reorganizing the Unit; therefore, the district court properly entered summary judgment for the District.

B. Retaliation

Title VII makes it unlawful for an employer to retaliate against an employee for filing a charge of discrimination.  *See* 42 U.S.C. § 2000e-3(a); *Borgo*, 204 F.3d at 255 n.5.  An act of retaliation gives rise to a separate cause of action under Title VII if it is of sufficient significance that it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe R.R. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted); *Rochon v. Gonzales*, 438 F.3d 1211, 1217-18 (D.C. Cir. 2006) (internal quotation marks omitted).

The officers refer to numerous incidents they claim constitute unlawful retaliation, ranging from unjustified reprimands to unwarranted drug testing.  Only one of the incidents, however, has any documentary support:  One month after the officers filed their discrimination charges with the EEOC, Lanier issued a memorandum announcing that because "there have been several Instances [sic] when the Special Operations Division has had little to no officers working on Saturdays and Sundays," she would require "two squads from every Branch that have middle of the week days off" to work weekends.  The memorandum then stated that "[t]hese squads will be formed strictly by seniority."

Two of the adversely affected officers contend this policy constituted retaliation. They do not dispute, however, that the Department had too few police officers working weekends or that the policy was implemented strictly upon the basis of seniority; nor do they give any reason to believe that Lanier's justification for the policy might have been pretextual. In sum, they assert the policy was retaliatory, but they proffered no evidence upon the basis of which a reasonable jury could agree. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) ("Because [the plaintiff's] claim of retaliation rests entirely upon a conclusory representation, the district court was right to dismiss it").

The officers' other claims of retaliation relate to supposedly undeserved disciplinary actions and other instances of harassment, but all their allegations are vague and even those that should have left a paper trail are unsupported by any documentary evidence. "[A] mere unsubstantiated allegation ... creates no genuine issue of fact and will not withstand summary judgment." *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993) (internal quotation marks omitted).

## III. Conclusion

The officers presented no evidence to impugn the MPD's nondiscriminatory justifications for moving the Canine Unit from permanent to rotating shifts. Their allegations of retaliation are conclusory, vague, and for the most part unsubstantiated. The judgment of the district court is therefore

*Affirmed.*