# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 14, 2016         Decided August 2, 2016

No. 15-5008

SAMUEL ORTIZ-DIAZ,
APPELLANT

v.

UNITED STATES DEPARTMENT OF HOUSING
& URBAN DEVELOPMENT, OFFICE OF INSPECTOR GENERAL,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cv-00726)

*Eden Brown Gaines* argued the cause and filed briefs for the appellant.

*Alexander D. Shoaibi*, Assistant United States Attorney, argued the cause for the appellee. *R. Craig Lawrence*, Assistant United States Attorney was with him on brief.

Before: HENDERSON, ROGERS and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

Concurring opinion filed by *Circuit Judge* HENDERSON.

Concurring opinion filed by *Circuit Judge* KAVANAUGH.

Dissenting opinion filed by *Circuit Judge* ROGERS.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Plaintiff Samuel Ortiz-Diaz appeals from the grant of summary judgment in favor of defendant United States Department of Housing and Urban Development (HUD) in his discrimination lawsuit brought pursuant to 42 U.S.C. §§ 2000e *et seq*. The district court found that the action complained of—denial of Ortiz-Diaz's requests for lateral transfers on the basis of race and/or national origin—was not cognizable under Title VII because it did not constitute an "adverse employment action." *Ortiz-Diaz v. United States Dep't of Housing and Urban Dev.*, 75 F. Supp. 3d 561, 568 (D.D.C. 2014). We affirm.

I.

Ortiz-Diaz began his employment with HUD in April 1998 as a criminal investigator in San Juan, Puerto Rico. In 2000 he was reassigned to Hartford, Connecticut to be closer to his wife, who was employed in Albany, New York. In 2009 Ortiz-Diaz applied for and accepted a promotion to senior special agent, a GS-14 position, in HUD's Office of Inspector General (OIG) in Washington, D.C. The promotion

was approved by Assistant Inspector General for Investigations John McCarty.[1]

In July 2010 Ortiz-Diaz applied for an Assistant Special Agent in Charge (ASAC) position in New York City (NYC) but was not selected. McCarty made the decision and Ortiz-Diaz believed that he was not selected because he is Hispanic. *See* Ortiz-Diaz Decl. ¶ 11, J.A. 611 ("I was angry because I believed that McCarty was . . . making improper personnel decisions based on race."). He told a colleague he was not going to "take it quietly" and that he was gearing up for "a super heavyweight fight." No "fight" ensued—apparently because Ortiz-Diaz subsequently learned that McCarty's selectee was also Hispanic.

On September 30, 2010 Ortiz-Diaz accepted a GS-13 level position as a program analyst with HUD's Office of Public and Indian Housing in Albany. Around this time McCarty, on learning that Ortiz-Diaz was seeking to leave OIG, asked the latter if he was interested in an ASAC vacancy in Chicago or, alternatively, a transfer to NYC at the GS-13 level. Instead of pursuing either option, in October 2010[2]

---

[1] Ortiz-Diaz received a relocation allowance for his move to D.C. which he was required to repay in the event he did not remain in that position for at least one year (until December 15, 2010).

[2] The district court order reflects that this event occurred in October 2014. Further blurring the time-line, Ortiz-Diaz's complaint indicates he requested this transfer on October 12, 2012. We believe both dates are inaccurate. Ortiz-Diaz's complaint indicates that he left HUD altogether on January 1, 2011. Moreover, he filed his complaint in May 2012. We arrive at October 2010 because that is the date contained in an Equal Employment Opportunity Commission investigative summary and because it is consistent with the rest of the time-line.

Ortiz-Diaz requested a transfer to an investigative position in Albany or Hartford pursuant to HUD's no-cost, voluntary transfer program. That program "allows investigators to request voluntary transfers to duty stations of their choice for reasons other than the specific staffing needs of the Agency," *Oritz-Diaz*, 75 F. Supp. 3d at 564, but the relocation is at the employee's expense. In addition, the program does not guarantee that a request will be approved; instead, an employee is considered for transfer as a vacancy arises. McCarty denied the request on October 12, 2010, stating that HUD OIG maintained no investigative office in Albany and that there was no vacancy in Hartford. Ortiz-Diaz filed his complaint on May 4, 2012 alleging that his October 2010 request was denied because he is Hispanic. The district court granted summary judgment to HUD because "[a]bsent extraordinary circumstances not present here, a purely lateral transfer does not amount to an adverse employment action" cognizable under Title VII. *Id.* at 565 (citing *Medina v. Henderson*, No. 98-5471, 1999 WL 325497 at *1 (D.C. Cir. Apr. 30, 1999)). The district court also found that a transfer from the D.C. headquarters would have necessitated a downgrade to the GS-13 level, which itself may have constituted an "adverse employment action." *Id.* at 565–66.[3] Finally, Ortiz-Diaz's then-pending motion to compel was

---

[3] The district court noted Ortiz-Diaz's claim that "it was common to maintain pay grades when transferred to the field" but concluded that he "provide[d] no evidence in support of this allegation." *Ortiz-Diaz*, 75 F. Supp. 3d at 566; *cf.* Decl. of HUD OIG Acting Assistant Inspector General of Investigations Lester Davis ¶ 3, J.A. 339 ("Senior Special Agents (GS-14) stationed with the Criminal Investigations Division who have requested reassignment to the field as a Special Agent have been required to accept a downgrade to Special Agent (GS-13)"). Ortiz-Diaz pressed the same point on appeal but again offered no supporting evidence.

denied because "even if Mr. Ortiz-Diaz uncovered all that he hopes for . . . it would not alter the conclusion that his denial of a lateral transfer was not an adverse employment decision." *Id.* at 568.

## II.

Title VII prohibits "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a); *see also Bundy v. Jackson*, 641 F.2d 934, 942 (D.C. Cir. 1981) (Title VII puts "same restrictions on federal . . . agencies as it does on private employers."). Under our Circuit precedent the action complained of must be "materially adverse" to support a discrimination claim. *Ginger v. District of Columbia*, 527 F.3d 1340, 1343 (D.C. Cir. 2008). At this stage, the "evidence of the [employee] is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Nevertheless, the employee must produce more than a "mere . . . scintilla of evidence," *id.* at 252, and "[c]onclusory allegations unsupported by fact[s] . . . will not create a triable issue." *Exxon Corp. v. FTC*, 63 F.2d 120, 127 (D.C. Cir. 1980); *see also Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

Ortiz-Diaz maintains that he clears the "materially adverse action" hurdle, our precedent notwithstanding. *See, e.g.*, *Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003) (plaintiff "denied a lateral transfer—that is, one in which [plaintiff] suffers no diminution in pay or benefits—does not suffer an actionable injury unless there are some *other* materially adverse consequences affecting the terms, conditions, or privileges of her employment." (emphasis

added)); *Forkkio v. Powell*, 306 F.3d 1127, 1130–31 (D.C. Cir. 2002) ("Purely subjective injuries, such as dissatisfaction with a reassignment . . . are not adverse actions. . . . In contrast with purely subjective harms, reassignment with significantly different responsibilities . . . generally indicates an adverse action." (internal quotation marks omitted)). He so contends because, in addition to his "dissatisfaction with [the lack of] reassignment," *id.* at 1130, the transfer denial tangibly injured his "career opportunities" in light of McCarty's allegedly discriminatory conduct and his belief that his promotion outlook would be rosier "if he worked for Special Agent in Charge . . . Rene Febles (who [is] Hispanic) in [Albany]," Appellant Br. 8, 28. He also claims that there was "high profile work" in Hartford and Albany and that performance of said work would have similarly "enhanced [his] promotion opportunities." Ortiz-Diaz Decl. ¶ 12, J.A. 611.

The desire to work for Febles (or, conversely, to escape McCarty) is irrelevant under our precedent. In *Forkkio* the plaintiff alleged that his supervisor took many "offensive" actions, including criticizing his work product and "ma[king] personnel decisions about [the plaintiff's] staff without consulting him." 306 F.3d at 1130. Apparently believing that discriminatory animus motivated these actions, the plaintiff filed three complaints with the Equal Employment Opportunity Commission. *Id.* When the controversy reached us, we held that working under the supervisor constituted, at most, "subjective injury" and was therefore not materially adverse. *Id.* at 1131–32. Even granting that perhaps in an extraordinary case having one supervisor instead of another could constitute adverse action, Ortiz-Diaz's preference is, apparently, simply a product of Febles's alleged freedom from "issues working with Hispanic men." Ortiz-Diaz Decl. ¶ 12, J.A. 611. If such a declaration were sufficient to raise a

jury issue, our materiality requirement would be an empty vessel indeed.[4]

Granted, a lateral transfer that increased promotion prospects *might* qualify, notwithstanding the "speculativeness of the harm." *See Douglas v. Donovan*, 559 F.3d 549, 552–53 (D.C. Cir. 2009). *Compare id.* at 553 ("failure to be recommended" for award "not categorically an adverse employment action" notwithstanding possibility of financial gain because of "inherent uncertainty" of recommendation leading to benefit), *with id.* at 552–53 (some actions, such as "hiring, firing, failing to promote, [and] reassignment with significantly different responsibilities . . . are conclusively presumed to be adverse employment actions, even if any alleged harm is speculative."). But, even if so, Ortiz-Diaz offered only a bare assertion that his transfer would enhance his promotion prospects. He alleged that there was "high profile" work in Hartford and Albany, Ortiz-Diaz Decl. ¶ 12, J.A. 611, but never described it nor linked it to his promotion prospects. Whether the Washington, D.C. headquarters— whence Ortiz-Diaz was seeking transfer—*also* included high profile work was similarly unaddressed. Also left unexplained was why he would seek transfer to a *lower* pay

---

[4] Our dissenting colleague takes issue with our analysis of the relevance of subjective injury under our precedent, noting that in *Ginger v. District of Columbia*, 527 F.3d 1340 (D.C. Cir. 2008), we held a change in work schedule can constitute materially adverse action. Dissent Op. 4. But in *Ginger* the plaintiffs in fact alleged "lost income as a result of the" change and, although the Court credited that a schedule change "*can*" suffice without monetary loss, the plaintiffs there were moved from a "permanent shift" to a "rotating shift" which "severely affected their sleep schedules and made it more difficult for them to work overtime and part-time day jobs." *Ginger*, 527 F.3d at 1343–44 (emphasis added). Those difficulties are plainly not subjective.

rate, *see supra* n.3,[5] when in fact McCarty was talking to him about an assistant special agent in charge position.[6]

In *Baird v. Gotbaum*, 662 F.3d 1246 (D.C. Cir. 2011), the plaintiff alleged, *inter alia*, that her employer's workplace rules, including a code of civility among employees, were

---

[5] Our dissenting colleague submits that Ortiz-Diaz proffered evidence that McCarty approved transfer requests in some instances without a grade reduction. Dissent Op. 7. That observation is beside the point because the locations to which *Ortiz-Diaz* requested transfer *did* result in a grade reduction and, as we explained, Ortiz-Diaz has not contested that fact.

[6] Our dissenting colleague finds that Ortiz-Diaz's declaration establishes the materially adverse action's existence *vel non*, *see* Dissent Op. 5–6, bypassing much well-established precedent in the process. First, self-serving averments ordinarily do not allow a Title VII plaintiff to survive summary judgment. *See Holcomb v. Powell,* 433 F.3d 889, 899 (D.C. Cir. 2006) (rejecting "purely conclusory" allegations of discriminatory animus at summary judgment); *Burke v. Gould*, 286 F.3d 513, 520 (D.C. Cir. 2002) ("[B]are allegations of discrimination are insufficient to defeat a properly supported motion for summary judgment."). More to the point, a Title VII plaintiff must produce "*evidence*" which "reasonable minds could differ as to the import of." *Liberty Lobby*, 477 U.S at 250–51 (emphasis added). But Ortiz-Diaz's declaration contains *no* evidence regarding, *inter alia*, Febles's supervisory virtues, the existence of "high profile" work in Hartford and Albany or the fit, if any, between a lower-rung position and accelerated promotion prospects. Finally, setting aside the sufficiency of Ortiz-Diaz's allegations, whether an action is materially adverse is not only a question of fact but a requisite of a Title VII claim, supported by a record of "*objectively* tangible harm" that is not "speculative." *Douglas*, 559 F.3d at 553, 556 (emphasis added). By contrast, the dissent's preferred authority counsels only that we "credit [Ortiz-Diaz's] *version of events*," *Robinson v. Pezzat*, 818 F.3d 1, 8 (D.C. Cir. 2016) (emphasis added), which we have done.

"terms, conditions, or privileges of employment with respect to which Title VII affords protection." *Id.* at 1250 (internal quotations omitted). We upheld the dismissal of a claim premised on a violation of the code. *Id.* As we explained, it was "*necessary* for her discrimination claims" to allege that a term, condition or privilege was affected but such an allegation was "in itself . . . plainly not *sufficient*." *Id.* (emphases added). Baird "evidently suppos[ed] that anything in that category ipso facto me[t] the adverse action test," but, as we made plain, she was wrong. *Id.*[7]

---

[7] Ortiz-Diaz cites *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111 (1985), as authority for his claim. Although the case involved a so-called "transfer," its facts make plain that the transfer was not *lateral*. Rather, in *Trans World* the defendant airline required a captain to cease working in that capacity at age 60. It allowed him to remain with the airline after attaining that age, however, as a "flight engineer"—but only through a bidding procedure that did not guarantee a position. *Id.* at 116. A captain under 60 who was unable to retain his position was permitted to "displace *automatically* . . . a less senior flight engineer" without participating in the bidding process, a benefit that formed the basis of an age discrimination claim. *Id.* (emphasis added). The Court referred to an age-disqualified captain's attempt to become a flight engineer as a "transfer request," *id.* at 118, but the "transfer" was in fact a forced demotion, a far cry from our lateral transfer definition which "does not involve a demotion in form or substance," *Brown v. Brody*, 199 F.3d 446, 456 (D.C. Cir. 1999).

Similarly, Ortiz-Diaz's reliance on contrary decisions of our sister circuits is misplaced. He cites *Randlett v. Shalala*, 118 F.3d 857 (1st Cir. 1997), for the proposition that, if "transfer . . . [is] a common enough practice," its denial is actionable under Title VII, Appellant Br. 23. The First Circuit, without explanation, concluded that, to Randlett, "transfer . . . was doubtless as important as a promotion." *Randlett*, 118 F.3d at 862. But *Randlett* held only that "refusal to transfer is [not] *automatically* outside Title VII," *id.*

For the foregoing reasons, the judgment of the district court is affirmed.

*So ordered.*

---

(emphasis added), a position consistent with our precedent, *see Stewart*, 352 F.3d at 426. Ortiz-Diaz's other cited cases, both within and without our Circuit, do not even involve transfer. *See Judie v. Hamilton*, 872 F.2d 919, 921–22 (9th Cir. 1989) (denial of supervisory responsibilities); *Scott-Brown v. Cohen*, 220 F. Supp. 2d 504, 511 (D. Md. 2002) (denial of advanced sick leave); *Paquin v. Fed. Nat'l Mortg. Ass'n*, 119 F.3d 23, 32 (D.C. Cir. 1997) (withdrawing proposed severance package); *Passer v. Am. Chem. Soc.*, 935 F.2d 322, 331 (D.C. Cir. 1991) (cancelling symposium honoring plaintiff).

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring: At oral argument Ortiz-Diaz's counsel posed a disturbing hypothetical. She claimed that, if we accept the defendant's argument, we would affirm dismissal of a suit challenging an employer's affixing a "whites-only" sign to a water cooler because "not a penny is lost by any worker . . . no one lost supervisory duties . . . [and it is] not in any way related to the actual workplace." Oral Arg. Recording 1:11–2:04. Although such action could, in my view, constitute a "discriminatorily hostile or abusive environment . . . sufficiently severe or pervasive" to sustain a hostile work environment claim under Title VII, *Harris v. Forklift Sys, Inc.*, 510 U.S. 17, 21 (1993), it has no relevance to our "materially adverse action" precedent.

KAVANAUGH, *Circuit Judge*, concurring: I join the majority opinion because it faithfully follows our precedents. Our cases hold that lateral transfers to different positions or posts with the same pay and benefits are ordinarily not changes in the "terms, conditions, or privileges" of employment. I write this concurrence simply to note my skepticism about those cases. In my view, a forced lateral transfer – or the denial of a requested lateral transfer – on the basis of race is actionable under Title VII. Based on our precedents, however, I join the majority opinion.

Rogers, *Circuit Judge*, dissenting: Once again the court returns to the issue of the proper role of the district court at summary judgment but this time stumbles badly.

**I.**

Samuel Ortiz-Diaz was a criminal investigator in the Office of the Inspector General at the U.S. Department of Housing and Urban Development. That Office had adopted a merit staffing plan, which includes a voluntary transfer program whereby employees, including investigators, could request transfer to a different location, at no cost to the government. The merit staffing plan's stated policy is that the program is to be administered without regard to race, sex, color, national origin, age, or disability. The program was a privilege of Ortiz-Diaz's employment. *See Hishon v. King & Spalding*, 467 U.S. 69, 75–76 (1984).

Following years of working for the Office of the Inspector General, Ortiz-Diaz accepted a GS-14 position in the central office in Washington, D.C. At some point, he requested a transfer to Albany, New York where the Special Agent in Charge in the region had requested an agent. When an email was circulated regarding a position in Hartford, Connecticut, Ortiz-Diaz also requested to transfer there. Both transfer requests were denied by his supervisor. Ortiz-Diaz viewed gaining criminal experience in the field as the way to advance within the Inspector General's Office, a view the government does not dispute. Instead, the government disputes Ortiz-Diaz's claim that the denials were due to his supervisor's bias against Hispanics and Puerto Ricans, *see* Am. Compl. ¶¶ 10–11, 16–18, and moved for summary judgment in the district court on the grounds that he had suffered no adverse employment impact and could not demonstrate pretext. The district court agreed as to the first ground. *Ortiz-Diaz v. U.S. Dep't of Housing & Urban*

*Dev.*, 75 F. Supp. 3d 561, 565–67 (D.D.C. 2014).

Ortiz-Diaz, however, had submitted his sworn declarations to the district court stating that a transfer to the field would provide the type of experience that would enable him to advance within the Inspector General's Office and he explained why. He also proffered evidence that his supervisor had approved transfer requests of white comparators without a decrease in pay or benefits, and that those transfers were approved notwithstanding the lack of an office or need in the transfer city, which were the reasons given for denying Ortiz-Diaz's transfer requests. He proffered as well a letter from a colleague corroborating his claim that his supervisor was biased against minorities. And the government's supplemental response to his discovery requests produced a list of the discrimination complaints that had been filed against Ortiz-Diaz's supervisor, who was responsible for approving his transfer requests and his future promotion within the D.C. Office.

Further, Ortiz-Diaz had filed a motion to compel "full and complete responses" to his discovery requests relating to potential comparators, stating the government had failed to produce documentary evidence of identified transfers and he could not independently determine which transfers were voluntary or involuntary. Responding to his opposition to summary judgment, the government had claimed that the five transfers mentioned by Ortiz-Diaz were in response to hardship applications or involved individuals who were not similarly situated.

After his transfer requests were denied, Ortiz-Diaz resigned from his GS-14 position in the Inspector General's Office, where had worked for nine years. He accepted a GS-13 position elsewhere in the Department.

**II.**

Summary judgment is appropriate only if the record evidence shows that "there is no genuine dispute as to any material fact" and that the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). This court, like the district court, must "'examine the facts in the record and all reasonable inferences derived therefrom in a light most favorable to' the nonmoving party." *Robinson v. Pezzat*, 818 F.3d 1, 8 (D.C. Cir. 2016) (quoting *DeGraff v. District of Columbia*, 120 F.3d 298, 299–300 (D.C. Cir. 1997); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970). Indeed, "[t]he evidence of the non-movant is to be believed." *Anderson*, 477 U.S. at 255. "This mode of analysis serves to separate the 'jury functions' of making '[c]redibility determinations . . . , weighing . . . the evidence, and . . . drawing . . . legitimate inferences from the facts' from the district court's role as the arbiter of legal questions." *Robinson*, 818 F.3d at 8 (quoting *Anderson*, 477 U.S. at 255) (alterations in original).

As this court explained in *Arrington v United States*, 473 F.3d 329 (D.C. Cir. 2006), "[a]lthough a jury might ultimately decide to credit the version of the events described by [the] defendant[] over that offered by the plaintiff, this is not a basis upon which a court may rest in granting a motion for summary judgment." *Id*. at 333 (internal quotation marks omitted). The summary judgment standard requires us to credit the plaintiff's version of events, even if "'directly contradictory' to other testimony." *Robinson*, 818 F.3d at 8 (quoting *Tolan v. Cotton*, 134 S. Ct. 1861, 1867 (2014)). "Thus, we do not 'determine the truth of the matter,' but instead decide only 'whether there is a genuine issue for trial." *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010).

**A.**

Today, the court, in concluding upon *de novo* review that Ortiz-Diaz did not suffer an adverse employment action as a result of the denial of his transfer requests, misapplies the summary judgment standard. In *Stewart v. Ashcroft*, 352 F.3d 422, 426–27 (D.C. Cir. 2003), the court explained that while lateral transfers entailing no diminution in pay and benefits were ordinarily not adverse employment actions, denials of transfers could be adverse employment actions if they result in "objective, tangible, and materially adverse consequences [affecting] the terms, conditions, or privileges" of the plaintiff's employment, *id.* at 426 (citing *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999)), even if the employee suffered no diminution in pay or benefits. The court referred, as an example, to denial of an opportunity to advance within the hierarchy of a department. *Id.* (citing *Brown*, 199 F.3d at 457). Although "purely subjective injuries, such as dissatisfaction with a reassignment," are not adverse actions, *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002), not all "dissatisfaction" is immaterial. For instance, in *Ginger v. District of Columbia*, 527 F.3d 1340, 1344 (D.C. Cir. 2008), the court concluded that a transfer of police officers to a more difficult and inconvenient work schedule could be an adverse action, even without a change in the officers' responsibilities or pay.

So have our sister circuits. For example, the First Circuit explained, noting the "pretty open-ended language" of "terms, conditions, or privileges," in Title VII, 42 U.S.C. § 2000e-2a, that an adverse employment action can include the denial of a lateral transfer in view of the "the impact on [the plaintiff]" and the plaintiff's affidavits that it was "customary practice" to grant "hardship" transfers. *Randlett v. Shalala*, 118 F.3d 857, 862 (1st Cir. 1997) (citing cases). Indeed, as Judge Harlington Wood, Jr., joined by Judge Ripple and Senior Judge Eschbach, wrote for the Seventh Circuit in reversing the grant of summary

judgment:

> One does not have to be an employment expert to know that an employer can make an employee's job undesirable or even unbearable without money or benefits ever entering into the picture.

*Collins v. Illinois*, 830 F.2d. 692, 703 (7th Cir. 1987).

Ortiz-Diaz proffered evidence not merely that he would be more satisfied working in Albany or Hartford, but that he would be better positioned to advance within the Inspector General's Office. According to Ortiz-Diaz's sworn declarations, a lateral transfer would have enhanced his opportunities for promotion. *See* Pltf.'s Decl. (June 25, 2014) in Support of Oppo. to Deft.'s Mot. for Sum. Judgment ¶ 12 ("Pltf.'s Decl."); Pltf.'s Supp. Decl. (Sept. 4, 2012) in Support of Oppo. to Deft.'s Mot. for Sum. Judgment ¶¶ 2, 4 ("Pltf.'s Supp. Decl."). Specifically, he explained that in order to better position himself for promotion, he sought "to return to the field in order to gain experience at the GS-14 level, establish favorable relationships with supervisors in the field, . . . and give [him]self a bit of distance from the discriminatory environment at headquarters." Pltf.'s Supp. Decl. ¶ 5. Investigators in Regions 1 and 2, to which he sought transfers, "were lauded for their accomplishments and there did not appear to be serious performance deficiencies" in those regions. *Id.* ¶ 6. The Albany and Hartford locations presented an opportunity to engage in "important, high profile work" that would enhance his chances of promotion. Pltf.'s Decl. ¶ 12. Additionally, in Albany, his supervisor would have been Rene Febles, an Hispanic whom Ortiz-Diaz believed would not be inclined to discriminate against him because he was an Hispanic and Puerto Rican. *Id.* By contrast, in the Washington, D.C. office, Ortiz-Diaz explained that he considered his chances of advancement limited because his supervisor was racially biased

against Hispanics and other minorities, and he was not alone in that view. *Id.* ¶¶ 6–7; *see* Letter from Patrick Jefferson to Eden Gaines Brown, Esq. (Mar. 12, 2012); Deft.'s Response to Interrogatories, Request No. 5 (Dec. 20, 2013) (supplemental discovery response listing discrimination complaints filed against Ortiz-Diaz's supervisor).

These are not mere "bare assertions" or subjective preferences, as the court suggests, *see* Op. 7; rather, they are objective statements — uncontested by the government — about the expected professional benefits to Ortiz-Diaz from the requested transfers. Evidence of his supervisor's discriminatory statements about Hispanics in the workplace and other complaints of discrimination filed against his supervisor not only corroborated Ortiz-Diaz's view of his supervisor's bias, but was relevant, contrary to Judge Henderson's view, to showing that denial of his transfer requests had "materially adverse consequences," *Forkkio*, 306 F.3d at 1131, on his chances for advancement if he remained in the D.C. Office. His resignation following nine years in the Inspector General's Office for a lesser paying job underscores the adversity caused by the denial of his transfer requests as a result of the discriminatory bind in which he found himself in the D.C. Office.

Such evidence is sufficient to create a triable issue as to whether the denial of Ortiz-Diaz's transfer requests constitutes a materially adverse employment action. The court, although acknowledging that "a lateral transfer with increased promotion prospects *might* qualify" as an adverse action, Op. 7, avoids this conclusion only by improperly discounting Ortiz-Diaz's sworn declarations. Yet, contrary to the court's view, *see* Op. 8 n.6, a plaintiff's sworn statement, even if uncorroborated, can provide sufficient evidence to establish a disputed issue of material fact. *See Robinson*, 818 F.3d at 9 (citing *Arrington*, 473 F.3d at 336, 338); *see also Tolan*, 134 S. Ct. at 1867. Ortiz-Diaz's

statements about the benefits of transfer are not unduly speculative or inappropriately conclusory, *see Forkkio*, 306 F.3d at 1131, in the context of the no-cost transfer program whereby an employee could switch job locations. This is not a case in which the plaintiff simply avers that his supervisor behaved with discriminatory intent, *see* Op. 8 n.6 (citing, *e.g.*, *Holcomb v. Powell*, 433 F.3d 889, 899 (D.C. Cir. 2006)), but a case in which the plaintiff stated objective facts about the world that could be proved or disproved at trial.

Furthermore, by questioning the credibility of Ortiz-Diaz's sworn statements that a position in the field would lead to better opportunities for advancement, the court fails on summary judgment, as the Supreme Court has repeatedly instructed, to construe the record and reasonable inferences "in the light most favorable to the party opposing the motion," here, Ortiz-Diaz. *Adickes*, 398 U.S. at 158–59 (internal quotation and citation omitted). Not only does the court err in taking a position never advanced by the government in moving for summary judgment, *see Pardo-Kronemann*, 601 F.3d at 609, the court errs in deriding as "lower rung" the positions to which Ortiz-Diaz sought to transfer in Albany and Hartford. Op. 7, 8 n.6. Ortiz-Diaz's evidence is to the contrary, explaining exactly why he considered the transfers to afford opportunities for professional advancement that his position in the D.C. Office did not, and the government has never challenged that evidence. Even if the court is referencing a transfer to a GS-13 position, Ortiz-Diaz proffered evidence that his supervisor approved other transfers without a diminution in grade. *See* Pltf.'s Oppo. to Sum. Judgment ¶ 24; Pltf.'s Decl. ¶ 20.

Whether an employment action is adverse is a question for the jury. *Pardo-Kronemann*, 601 F.3d at 607. The government did not dispute that in-field criminal-investigative work was the path for Ortiz-Diaz to position himself for promotion, or that

Regions 1 and 2 were prime locations for doing so. Yet the court today demands more details. *See* Op. 7. On what basis? The government has never contested Ortiz-Diaz's claims on that ground, and "the evidence of the non-movant is to be believed," *Anderson*, 477 U.S. at 255. Neither did the government challenge that the no-cost transfer program was a privilege of his employment, *see Hishon*, 467 U.S. at 75–75. Febles' email requesting an investigator in Albany and the email about the transfer opportunity in Hartford, as well as a Hartford position that was filled shortly after Ortiz-Diaz resigned, were corroborative of the availability of the opportunities for transfer to prime in-field locations. Ortiz-Diaz's resignation and acceptance of a lower paying position lends gravitas, at this stage of the proceedings, to the record evidence and reasonable inferences therefrom of adversity as a result of being denied an opportunity for professional advancement. *See Stewart*, 352 F.3d at 427; *cf. Bouman v. Block*, 940 F.2d 1211, 1229 (9th Cir. 1991).

Under the circumstances, upon viewing the evidence most favorably to Ortiz-Diaz as the non-moving party, as the court must, a reasonable jury could find the denials of the requested transfers under the no-cost transfer program caused him "objectively tangible harm." *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009). Nothing in our precedent requires a different outcome on summary judgment, and the court offers no analysis for the conclusion it does. *See* concurring op., Kavanaugh, J. Instead, the court's conclusion appears to indicate, much as Ortiz-Diaz's counsel suggested during oral argument, that there can be no material adversity from transfer denials where a supervisor has a policy that, notwithstanding a concrete opportunity for professional advancement, no Hispanics need apply for the no-cost transfer program at the D.C. Office of the Department's Inspector General's Office. *See* Oral Arg. Rec. 18:49–19:04 ("You have a discriminatory

decisionmaker saying that only whites . . . can participate in this [no-cost transfer] program."). Yet no court could condone that result.

## B.

Furthermore, on this record, there is no other basis to grant summary judgment to the government on the merits of Ortiz-Diaz's discrimination claims. Again, the court must consider the evidence and reasonable inferences most favorably to Ortiz-Diaz as the non-moving party. Also, "summary judgment [must] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Anderson*, 477 U.S. at 250 n.5 (citing FED. R. CIV. P. 56(f)); *see Russell v. Principi*, 257 F.3d 815, 820–21 (D.C. Cir. 2001).

In moving for summary judgment, the government stated that Ortiz-Diaz's requested transfers were denied because there was no available position and no need for another agent in either Albany or Hartford at the time of his transfer request. *See* Deft.'s Statement of Material Facts in Support of Sum. Judgment ¶¶ 17–19. Ortiz-Diaz's factual statement in opposing summary judgment disputed these factual assertions. *See* Pltf.'s Statement of Material Facts in Dispute ¶¶ 17–19. Nonetheless, once an employer offers a legitimate, non-discriminatory reason for the adverse action, the "one central question" is whether Ortiz-Diaz has proffered "sufficient evidence for a reasonable jury to find that the [government's] asserted non-discriminatory reason was not the actual reason and that the [government] intentionally discriminated against [him] on the basis of [his membership in a protected class]." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). "Employees may cast doubt on the employer's proffered reason by, among other things, pointing to [1] changes and inconsistencies in the stated reasons for the adverse action; [2] the employer's failure to

follow established procedures or criteria; [3] the employer's general treatment of minority employees; or [4] discriminatory statements by the decisionmaker." *Evans v. Sebelius*, 716 F.3d 617, 620 (D.C. Cir. 2013) (internal quotation marks omitted); *Morris v. McCarthy*, No. 14-5074, 2016 WL 3254902, at *5 (D.C. Cir. June 14, 2016) (citing *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998)); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). In opposing summary judgment, Ortiz-Diaz presented arguments, based on record evidence, to cast doubts for each of these reasons on the government's asserted non-discriminatory reasons. *See* Pltf.'s Oppo. to Sum. Judgment Part IV C, D. "Although evidence of pretext is not *per se* sufficient to permit an inference of [discrimination], it usually will be enough to get a plaintiff's claim to the jury." *Pardo-Kronemann*, 601 F.3d at 604 (internal quotation and alterations omitted).

Ortiz-Diaz sought to show pretext in part through evidence that transfer requests of similarly situated white employees were granted, regardless of agency need or existing vacancies or offices. *See* Pltf.'s Mem. in Support of Mot. to Compel 3. Such evidence is relevant to demonstrating pretext. Showing that transfers of white comparators were routinely approved notwithstanding the absence of vacancies or offices in the transfer location could demonstrate that the reasons given for denying his transfer requests are "unworthy of credence," *Reeves*, 530 U.S. at 143 (quoting *Tex. Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). In addition, Ortiz-Diaz's declaration specifically recounted his supervisor's discriminatory statements about Hispanics in the workplace, *see* Pltf.'s Decl. ¶¶ 6–7, and there was evidence discrimination complaints had been previously filed against his supervisor. Such statements by a supervisor, this court has held, are sufficient to defeat summary judgment. *See Morris*, No. 14-5071, 2016 WL 3254902, at *7 (citing cases). To the extent the

government attempted to show that Ortiz-Diaz's supervisor was not biased against Hispanics, *see* Mem. of Points & Auth. in Support of Deft.'s Mot. for Sum. Judgment at 5–6, at the summary judgment stage the court must credit Ortiz-Diaz's evidence, as the non-movant, and accord all reasonable inferences from the evidence in his favor. *See Adickes*, 398 U.S. at 158; *see also Anderson*, 477 U.S. at 255. Credibility is a question for the trier of fact. *See Reeves*, 530 U.S. at 142.

And even if Ortiz-Diaz had not proffered sufficient evidence of pretext to preclude summary judgment, Ortiz-Diaz's motion to compel full and complete discovery would need to be addressed anew. *Cf. Russell v. Principi*, 257 F.3d at 820–21. In moving to compel, Ortiz-Diaz argued that in discovery the government had failed to produce documents or to indicate which of the transfers it had identified were voluntary as opposed to mandatory; he was unable to identify them but a government witness had explained there was a paper trail by which the government could. *See* Mot. to Compel 3–4; Pltf.'s Oppo. to Deft.'s Mot. for Sum. Judgment at 15–16; Depo. of Lester Davis, Acting Insp. General of Investigations, HUD, at 14, 21 (Apr. 8, 2014). The district court never considered the motion in connection with the question whether Ortiz-Diaz had shown pretext; in granting summary judgment on the ground Ortiz-Diaz had failed to establish an adverse employment action, the district court denied the motion on the ground that it would not produce evidence that would alter its conclusion on that issue. *See Ortiz-Diaz*, 75 F. Supp. 3d at 565–68. Because the motion to compel sought evidence of pretext, summary judgment would be inappropriate.

Accordingly, because on summary judgment the evidence is to be viewed most favorably to the party opposing the motion, a reasonable jury could find that the denial of Ortiz-Diaz's transfer requests adversely affected his opportunity for professional

advancement, *see Stewart*, 352 F.3d. at 427, and because, as the district court observed, the reasons for the denial of his transfer requests were "hotly disputed," *Ortiz-Diaz*, 75 F. Supp. 3d at 564, summary judgment is inappropriate.  I respectfully dissent.