# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 14, 2016

Decided August 2, 2016
Reissued August 11, 2017

No. 15-5008

SAMUEL ORTIZ-DIAZ,
APPELLANT

v.

UNITED STATES DEPARTMENT OF HOUSING & URBAN
DEVELOPMENT, OFFICE OF INSPECTOR GENERAL,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cv-00726)

*Eden Brown Gaines* argued the cause and filed the briefs for appellant.

*Alexander D. Shoaibi*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief was *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: HENDERSON, ROGERS and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

Opinion concurring in the judgment filed by *Circuit Judge* HENDERSON.

Concurring opinion filed by *Circuit Judge* ROGERS.

Concurring opinion filed by *Circuit Judge* KAVANAUGH.

ROGERS, *Circuit Judge*: This is a Title VII appeal from the grant of summary judgment to the government and the denial of a motion to compel the production of evidence. Samuel Ortiz-Diaz was a criminal investigator in the Office of the Inspector General at the U.S. Department of Housing and Urban Development. Pursuant to the Office's voluntary transfer program whereby employees could request transfer to a different location, at no cost to the government, Ortiz-Diaz requested transfers that would have improved both his professional advancement and personal circumstances. Specifically, he sought to move away from a supervisor whom he believed was biased against him and other minorities, to a field office that would afford him valuable experience and allow him to live in or closer to Albany, New York, where he and his wife maintained their home. His requests were summarily denied by that same supervisor, despite the fact that other, non-minority employees had routinely been granted similar transfers.

Ortiz-Diaz sued the Department, alleging unlawful race and national origin discrimination under Title VII, 42 U.S.C. §§ 2000e *et seq.* The district court granted summary judgment on the ground that Ortiz-Diaz failed to offer sufficient evidence that he suffered an adverse employment action. *Ortiz-Diaz v. United States Dep't of Hous. & Urban Dev.*, 75 F. Supp. 3d 561, 568 (D.D.C. 2014). This court, over a dissent, affirmed, *Ortiz-Diaz v. United States Dep't of Hous. & Urban Dev.*, 831 F.3d 488, 493 (D.C. Cir. 2016), and Ortiz-Diaz filed a petition for rehearing *en banc*. Before that petition was resolved, the

original three-judge court decided *sua sponte* to reconsider the case and vacated its opinion. We now conclude upon further consideration that nothing in our Title VII precedent would bar Ortiz-Diaz from proceeding to trial and that he has otherwise proffered sufficient evidentiary support to show summary judgment was inappropriate. Accordingly, we reverse and remand his case to the district court for further proceedings.

**I.**

On appeal from the grant of summary judgment, the court must view the evidence in the light most favorable to Ortiz-Diaz as the non-moving party, drawing all reasonable inferences in his favor. *See, e.g.*, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The following factual background is drawn primarily from two sworn declarations submitted by Ortiz-Diaz in opposing the Department's motion for summary judgment. *See generally* Pl.'s Decl. in Support of his Opp'n to Def.'s Mot. for Summ. J. ("Ortiz-Diaz Decl."); Pl.'s Supp. Decl. in Support of his Opp'n to Def.'s Mot. for Summ. J. ("Ortiz-Diaz Supp. Decl.").

**A.**

Prior to working at HUD's Washington, D.C. headquarters, Ortiz-Diaz had been assigned to its Hartford, Connecticut location in order to be closer to his wife, with whom he lived in Albany, New York. His 2009 transfer to Washington was intended to enhance his career prospects, and indeed it came with a promotion to senior special agent, but Ortiz-Diaz never abandoned the hope of returning to a position in Albany, where the couple continued to maintain a home they owned.

In Washington, D.C., Ortiz-Diaz worked in close proximity to Assistant Inspector General John McCarty, who, although not

Ortiz-Diaz's immediate supervisor, made personnel decisions and had the ability to affect Ortiz-Diaz's advancement within the Office. McCarty, for instance, was the ultimate decisionmaker regarding employee promotions. He also had to approve all transfer requests under the Office's transfer program. McCarty had previously exercised his transfer authority over Ortiz-Diaz; shortly after Hurricane Katrina, McCarty involuntarily transferred Ortiz-Diaz and an African-American investigator to Mississippi, over Ortiz-Diaz's protest, while non-minority investigators who similarly protested were not transferred.

Upon his arrival in the Washington, D.C. headquarters, Ortiz-Diaz soon observed incidents that suggested a discriminatory work environment was fostered by McCarty. He heard McCarty refer to the "hired help," which he understood as a derogatory reference to minority employees; he witnessed McCarty referring to Latino employees by the same name, or by the names of other Latino employees, claiming that Latinos "all look alike;" and he learned of discrimination complaints filed against McCarty by other minority employees. Ortiz-Diaz Decl. ¶ 7. A former co-worker said he left HUD as a direct result of his dealings with McCarty, whom he believed was biased against minority men like himself. According to the former co-worker, it was "common knowledge that McCarty repeatedly denied and/or attempted to deny promotion opportunities to minorities." Letter from Patrick Jefferson to Eden Gaines Brown at 1.

As a result, Ortiz-Diaz came to the conclusion that his career would suffer if he remained in close proximity to McCarty at headquarters. Believing that a return to the field would offer valuable experience and establish relationships with field supervisors who could support his future promotional efforts, he began exploring his prospects for a transfer. He

identified opportunities in Albany and Region 1 (New England), where he would be supervised by Special Agent in Charge Rene Febles. Febles and others working in Region 1 informed Ortiz-Diaz of the important, high-profile work done there that needed the attention of capable agents. This was in contrast to other, underperforming regions that were generally viewed unfavorably at headquarters, such that Ortiz-Diaz believed his career would suffer if he were to transfer there, as McCarty had previously recommended. Febles indicated to Ortiz-Diaz that he could use another agent, that he thought Ortiz-Diaz would be a good fit, and that it would be acceptable for Ortiz-Diaz to work either from his Albany home or from the Department's Albany office. Although there were no regularly stationed investigators in the Albany office, it was routine practice for investigators to work remotely, particularly given that the nature of their work often required them to work in the field conducting interviews and working alongside law enforcement.

Pursuant to the Department's no-cost voluntary transfer program, Ortiz-Diaz placed his name on a list of agents requesting transfer and indicated Albany as his preferred destination. That program, which does not guarantee that any request will be approved, is to be administered "without regard to race, sex, religion, color, national origin, age or disability." Office of Inspector Gen., Dep't of Housing & Urban Dev., Merit Staffing Plan at 7 (Nov. 2010); *see Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 120–21 (1985). The program had previously enabled non-minority employees to transfer between offices, and in some of those instances, new positions were created in order to facilitate the requested transfers. McCarty was involved in each of those decisions.

Ortiz-Diaz, having learned of an additional opening in Hartford, approached his immediate supervisors to discuss transfer but they advised him to ask McCarty directly for a

transfer to Albany or Hartford. McCarty denied both requests without explanation. Over the course of this litigation, McCarty has since stated that the denials resulted from the lack of an investigative office in Albany and the lack of an open position in Hartford, even though many investigators were allowed to work remotely and the Hartford position was filled shortly *after* Ortiz-Diaz's transfer request was denied. Ortiz-Diaz resigned in 2011 three months after his transfer requests were denied, leaving the Office where he had worked since 1998 to accept a lower-paying position elsewhere in the Department.

**B.**

To succeed on his Title VII claims, Ortiz-Diaz was required to show, among other things, that he suffered an adverse employment action. *Ginger v. District of Columbia*, 527 F.3d 1340, 1343 (D.C. Cir. 2008). "Purely subjective injuries, such as dissatisfaction with a reassignment, or public humiliation or loss of reputation," will not suffice. *Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002). Instead, a plaintiff denied a purely lateral transfer must show some other materially adverse consequence affecting the terms, conditions, or privileges of employment or future employment opportunities, whereby a reasonable trier of fact could find that he suffered objectively tangible harm. *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999).

The district court granted summary judgment to the Department on the ground that Ortiz-Diaz failed to show that he suffered an adverse employment action. *Ortiz-Diaz*, 75 F. Supp. 3d at 568. It concluded that Ortiz-Diaz's inability to live closer to his wife constituted only a "subjective, personal disappointment[]" that is not materially adverse, *id.* at 566, and that Ortiz-Diaz failed to offer anything more than "speculation" that transfer would have bettered his career opportunities, despite recognizing that the latter harm could suffice if

supported by competent evidence, *see id.* at 566–67. The district court also denied Ortiz-Diaz's motion to compel the Department to produce evidence from its records, concluding that the evidence sought, even if favorable to Ortiz-Diaz, would not affect his inability to show an adverse employment action. *Id.* at 568.

This court's review of the grant of summary judgment is *de novo*. *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 215 (D.C. Cir. 2013). Summary judgment is only appropriate when, viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact. *Id.*; Fed. R. Civ. P. 56(a). The court reviews the denial of a motion to compel discovery for abuse of discretion. *Russell v. Principi*, 257 F.3d 815, 820 (D.C. Cir. 2001).

## II.

Title VII prohibits "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a). Its primary objective "was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417 (1975) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 429–30 (1971)). Title VII was enacted at a time when racially and ethnically biased supervisors left employees with two options: (1) quit their jobs, imperiling their ability to work and survive economically, or (2) endure the discrimination, and the attendant economic and professional toll it inflicted. Congress created a third option by empowering employees to demand equal treatment and to be "ma[d]e . . . whole for injuries suffered on account of unlawful employment discrimination." *Albemarle*

*Paper Co.*, 422 U.S. at 418.

Ortiz-Diaz's allegation of harm, that he was denied a transfer away from a racially and ethnically biased supervisor to a non-biased supervisor more likely to advance his career, falls within Title VII's heartland.  Although lateral transfers to different positions within a Department offering the same pay and benefits are ordinarily not changes in the "terms, conditions, or privileges of employment," 42 U.S.C. § 2000e-2(a); *see Brown*, 199 F.3d at 457, a discriminatory denial of a lateral transfer away from a biased supervisor can certainly be actionable under Title VII, given the adverse impact on the employee's potential for career advancement. *See Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003).  Nothing in this court's precedent on lateral transfers or material adversity requires a contrary result.  For instance, even in *Brown*, 199 F.3d at 457, where the court held that the denial of a lateral transfer did not constitute a materially adverse action because the plaintiff expressed only subjective disappointment at the denial, the court recognized that a showing of "consequences affecting . . . future employment opportunities" could be sufficient. *Id.*  Precedent of our sister circuits is to the same effect. *See Randlett v. Shalala*, 118 F.3d 857, 861–62 (1st Cir. 1997); *Collins v. Illinois*, 830 F.2d 692, 704 (7th Cir. 1987); *Rodriguez v. Bd. of Educ.*, 620 F.2d 362, 366 (2d Cir. 1980).

Our precedent outside the lateral transfer context bears little on Ortiz-Diaz's claims.  In *Forkkio*, 306 F.3d at 1132, the court concluded there was no showing of material adversity where the plaintiff was simply assigned to work for an unpleasant, overly critical supervisor, much as the district court had observed that "[t]he essence of [Forkkio's] complaint is that he did not appreciate Mr. Cherry's method of supervision," *Forkkio v. Tanoue*, 131 F. Supp. 2d 36, 45 (D.D.C. 2001).  Similarly, the court has held unduly speculative claims of harm arising from

the denial of a recommendation for an award, *Douglas v. Donovan*, 559 F.3d 549, 553 (D.C. Cir. 2009), and from a temporary, unrealized exposure to being laid off, *Russell*, 257 F.3d at 819–20.  But the relatively minor, attenuated harms rejected as a matter of law in *Forkkio* and *Russell* are a far cry from the career-stifling transfer denials of which Ortiz-Diaz complained.  So too, the "garden-variety workplace tension" that was deemed immaterial in *Baird v. Gotbaum*, 662 F.3d 1246, 1249–50 (D.C. Cir. 2011), bears no resemblance to the adversity Ortiz-Diaz faced as a result of the denial of transfer away from his allegedly discriminatory supervisor.

In other words, under our Title VII precedent, Ortiz-Diaz's Title VII claims involve far more than a mere dislike of McCarty, *see Forkkio*, 306 F.3d at 1132, or a "subjective preference[]" to work for Febles in Albany, *Brown*, 199 F.3d at 457 (quoting *Doe v. Dekalb Cty. Sch. Dist.*, 145 F.3d 1441, 1448 (11th Cir. 1998)).  Indeed, his claims of adversity involve far more than the harm found *sufficient* in *Russell*, 257 F.3d at 818–19, the reduction of a bonus as a result of a worse-than-expected performance evaluation.  Ortiz-Diaz proffered evidence that McCarty's bias against minorities would have hindered his career advancement if he remained at headquarters, and that a transfer to work under Febles' supervision would have improved the likelihood that his career could advance based solely on merit.  As the district court recognized, *Ortiz-Diaz*, 75 F. Supp. 3d at 567, this states a cognizable injury to Ortiz-Diaz's "future employment opportunities." *Brown*, 199 F.3d at 457; *see also Stewart*, 352 F.3d at 426.  On the other hand, the district court's distinction between the ability to be considered for transfer from the ultimate transfer decision, *Ortiz-Diaz*, 75 F. Supp. 3d at 565, cannot be squared with this court's rejection of such distinctions in *Hopkins v. Price Waterhouse*, 920 F.2d 967, 978 (D.C. Cir. 1990) (discussing *Hishon v. King & Spalding*, 467 U.S. 69, 77–78 (1984)).  Title VII "promises [Ortiz-Diaz]

*nondiscriminatory* consideration for [a no-cost transfer] where consideration is held out as a privilege of employment." *Hopkins*, 920 F.2d at 978.

The Department's efforts to minimize the legal significance of the claimed injury are likewise not well-taken. It should go without saying that Ortiz-Diaz's legally protected interest in avoiding a racially and ethnically biased supervisor is more weighty than a "personal preference[]." *See* Appellee Br. 12. Nor can the claimed harm be written off as "based largely on speculation." *See id.* at 13–15. The burden to show harm arising from diminished career prospects is necessarily rooted in probabilities — here, that a requested transfer would likely have better advanced Ortiz-Diaz's career than staying in the discriminatory work environment fostered by McCarty. Although a claimed harm cannot be so unduly speculative as to be immaterial, *see Douglas*, 559 F.3d at 553, the evidence proffered by Ortiz-Diaz does not suffer from that deficiency, as we discuss in more detail below, instead presenting genuine disputes of material fact that rendered summary judgment inappropriate.

The only remaining question is whether Ortiz-Diaz has provided sufficient evidence to allow a reasonable juror to find for him. *Czekalski v. Peters*, 475 F.3d 360, 365 (D.C. Cir. 2007); *see also Pardo-Kronemann v. Donovan*, 601 F.3d 599, 607 (D.C. Cir. 2010). The district court's conclusion that he had not was based on a fundamental error of law. It ruled that Ortiz-Diaz had offered only "his own speculation" that transfer would have improved his career opportunities, *Ortiz-Diaz*, 75 F. Supp. 3d at 567, but this court has repeatedly held that under certain circumstances a plaintiff's sworn declaration can create a genuine issue of material fact and thereby render summary judgment inappropriate. *E.g.*, *United States v. Seventeen Thousand Nine Hundred Dollars ($17,900.00) in United States*

*Currency*, 859 F.3d 1085, 1092–93 (D.C. Cir. 2017); *Chenari v. George Washington Univ.*, 847 F.3d 740, 747–48 (D.C. Cir. 2017); *Arrington v. United States*, 473 F.3d 329, 337–38 (D.C. Cir. 2006).

In his sworn declarations, Ortiz-Diaz offered the following objective, non-conclusory statements of fact:

- the requested transfer would allow him "to gain [investigative field] experience at the GS-14 level, [and to] establish favorable relationships with supervisors in the field," whose support "would make it more difficult for McCarty to deny a promotion for [him]," Ortiz-Diaz Supp. Decl. ¶ 5;

- the regions to which Ortiz-Diaz sought transfer were viewed favorably at headquarters, did not appear to be plagued by the same performance deficiencies that existed in other regions, and investigators in his chosen regions were lauded for their accomplishments, *id.* ¶ 6;

- Special Agent in Charge Febles had need for another investigator, thought Ortiz-Diaz would be a good fit for the "important, high profile work which needed the attention of capable agents," and others in that region confirmed the quality of available work there, Ortiz-Diaz Decl. ¶¶ 12–13;

- McCarty had involuntarily transferred minority investigators to Mississippi while granting non-minority investigators' requests to remain where they were, *id.* ¶ 6;

- McCarty had repeatedly made remarks that to

Ortiz-Diaz indicated a bias against minorities, and McCarty had been the subject of discrimination complaints filed by other minority employees, *id.* ¶ 7.

Even leaving aside the former co-worker's letter further indicating McCarty's bias, and the Department's acknowledgment of other discrimination complaints against McCarty, the declarations alone provided sufficient competent evidence to allow a reasonable juror to infer, as did Ortiz-Diaz himself, that a transfer away from McCarty to Febles' supervision would have improved his career prospects. *See Stewart*, 352 F.3d at 427; *see also Bouman v. Block*, 940 F.2d 1211, 1229 (9th Cir. 1991). In any event, the co-worker's letter and the Department's acknowledgment corroborated Ortiz-Diaz's declarations regarding McCarty's discriminatory conduct.

Furthermore, the Department does not dispute that, as a general matter, investigative experience in the field helps one's prospects for advancement within the Office, *see* Oral Arg. Tr. 30:11–23, which buttresses Ortiz-Diaz's sworn testimony that the additional field experience resulting from transfer "would have better prepared [him] for promotion," Ortiz-Diaz Supp. Decl. ¶¶ 4–5. Nor does the Department make an undisputed showing that the transfer would have necessarily entailed a demotion and/or decrease in pay, *but see Ortiz-Diaz*, 75 F. Supp. 3d at 565–66, given record evidence that other non-minority employees were allowed to remain at the GS-14 level following transfer, and McCarty's own admission that he discussed with Ortiz-Diaz a transfer to New York City that would have allowed him to remain at GS-14.

Ortiz-Diaz also proffered sufficient evidence to show genuine disputes of fact concerning other elements of his claim

(discriminatory motive, pretext), which indirectly bear upon the issue of material adversity. In other words, in the context of Ortiz-Diaz's particular claim, it logically follows that the stronger his showing that McCarty discriminated against him in denying the transfers, the stronger his claim that remaining with McCarty at headquarters would have materially harmed his career. Thus, evidence that McCarty facilitated transfers for non-minority employees even to offices without an open position strengthened the inference that McCarty's refusal to do so for Ortiz-Diaz was rooted in racial and ethnic bias. This by extension strengthened the inference that the transfer denials were materially adverse. *But see Ortiz-Diaz*, 75 F. Supp. 3d at 568. Similarly, evidence that similarly situated investigators had previously been allowed to work remotely or from Department locations without an investigative office, and evidence that the Hartford position remained open until months after Ortiz-Diaz's resignation, strengthened the inference that McCarty's stated rationale for the transfer denials was pretextual. *See Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115 (D.C. Cir. 2016). Again, this evidence also bore upon the material adversity of the transfer denials. *But see Ortiz-Diaz*, 75 F. Supp. 3d at 568.

Our colleague doubts that McCarty was biased against minority employees, in light of evidence that McCarty had previously promoted Ortiz-Diaz to senior special agent, and hired another minority investigator as Assistant Special Agent in Charge in New York City. *See* Concurring Op. 4 (Henderson, J.). Even assuming such evidence could be sufficient for a reasonable factfinder to conclude McCarty harbored no racial or ethnic bias, this court's role at summary judgment is not to find facts in lieu of a jury, particularly not against the non-moving party. The court must merely determine whether sufficient evidence exists for a reasonable jury to find in Ortiz-Diaz's favor, *i.e.*, that McCarty *did* harbor such a bias. *Tolan*, 134 S.

Ct. at 1866.  For the reasons discussed, Ortiz-Diaz met that burden with documentary evidence and sworn testimony offering objective, non-conclusory statements of fact that are capable of proof at trial.  Even though there may be evidence cutting against Ortiz-Diaz's claims, that evidence only highlights the need for this case to be decided by a jury.  And even if the jury ultimately agrees that the evidence of bias "is, at most, slight," Concurring Op. 4 (Henderson, J.), it would in no way undermine the result the court reaches today.

In view of the reversal of the grant of summary judgment, the district court must reconsider Ortiz-Diaz's motion to compel the production of evidence by the Department regarding voluntary, no-cost transfers granted to non-minority employees, evidence of vacancy announcements, facts to support the Department's defenses, as well as prior complaints of discrimination against supervisors and the like. *See Russell*, 257 F.3d at 820–21.  As discussed, the district court's reasoning — that none of the requested information would alter the conclusion that denial of a lateral transfer is not an adverse employment decision, *Ortiz-Diaz*, 75 F. Supp. 3d at 568 — was manifestly flawed.

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring in the judgment: I concur in the judgment which sends this case to a jury to resolve because the record could be read to contain at least one genuine issue of material fact, thereby precluding summary judgment. But I have reservations about my colleagues' discussion of the factual record. I therefore write separately to explain the potential fact dispute I see and why I believe the majority's broader approach is unwise.

I.

Ortiz-Diaz began working as a criminal investigator for HUD in April 1998. In 2000, after his wife accepted a job in Albany, New York, he requested and received a transfer to work in Hartford, Connecticut. But in 2009, Ortiz-Diaz wanted to change jobs again. He applied for a promotion to senior special agent with the Criminal Investigation Division in Washington, D.C. McCarty approved the promotion, which came with a raise—Ortiz-Diaz moved from GS-13 to GS-14 on the government pay scale. Nevertheless, Ortiz-Diaz wanted to return to New York. Within several months, he applied for an Assistant Special Agent in Charge (ASAC) position in New York City. Ortiz-Diaz interviewed with McCarty but was ultimately not selected. Ortiz-Diaz believed he was not selected because of his race. As it turned out, the successful candidate—whom McCarty approved—was also Hispanic. Aware Ortiz-Diaz was upset over his non-selection, McCarty asked if Ortiz-Diaz was interested in certain other positions, including an ASAC vacancy in Chicago. Ortiz-Diaz pursued none of them.

Instead, he requested a transfer to an investigative position in Albany or Hartford. These locations appealed to him in part because they would enable him to work in Region 1[1] or under

---

[1] Region 1 includes Hartford, Connecticut.

2

Febles. Even though a transfer likely would have entailed a pay cut, Ortiz-Diaz believed that working under Febles—whom he described as a "solid supervisor"—would "enhance[] [his] promotion opportunities." Joint Appendix 611. Moreover, he understood from conversations with Febles that he could work remotely from Albany. Similarly, based on communications with Region 1 officials, Ortiz-Diaz believed "there was important, high profile work" to be done which "needed the attention of capable agents." *Id.*

In hopes of securing a transfer, Ortiz-Diaz sought to use HUD's no-cost[2] voluntary transfer program. The no-cost transfer program allows qualifying employees to transfer for reasons other than HUD staffing needs. As detailed in internal HUD documents, an employee initiates his request by formally submitting a written document to the proper HUD official—McCarty, in Ortiz-Diaz's case. But when Ortiz-Diaz contacted McCarty, he was told, without explanation, that he could not transfer to Albany or Hartford. This was so even though a vacancy had earlier been announced in Hartford and Febles told him he could work in Albany.

II.

On these facts, I agree that a jury should consider Ortiz-Diaz's Title VII claim in light of the peculiar features of HUD's no-cost transfer program and its potential to aid Ortiz-Diaz's professional development.

A.

An employment action cannot support a Title VII discrimination claim unless it "has materially adverse

---

[2] It is called a "no-cost" transfer because relocation costs are borne by the transferee.

consequences affecting the terms, conditions, or privileges of the plaintiff's employment such that a reasonable trier of fact could find objectively tangible harm." *Ginger v. District of Columbia*, 527 F.3d 1340, 1343 (D.C. Cir. 2008) (brackets, ellipses and internal quotation marks omitted). The United States Supreme Court has interpreted the "term[], condition[], or privilege[]" label broadly. It can apply to everything from a security clearance, *see Niskey v. Kelly*, 859 F.3d 1, 8 (D.C. Cir. 2017), to a bonus, *see Russell v. Principi*, 257 F.3d 815, 818–19 (D.C. Cir. 2001), to eligibility for election to a law firm's partnership, *see Hishon v. King & Spalding*, 467 U.S. 69, 75 (1984).

So recognizing, I believe it may also apply to HUD's no-cost transfer program. The program was spelled out in internal HUD documents. Established procedures governed how an employee could submit a request. And the program may have operated as a salve to special agents, whose jobs also required a separate "mobility agreement" permitting an agent's involuntary transfer based on HUD needs. Ortiz-Diaz believed he could use it to gain valuable experience and enhance his promotion potential. Indeed, he was willing to risk a pay cut to obtain that experience.[3] On these facts, I believe the program could qualify as a "privilege" of his employment, raising a genuine issue of material fact for jury resolution.

## B.

My colleagues reach a similar conclusion but by a different route. In their view, the denial of a lateral transfer away from McCarty is itself actionable under Title VII, because his

---

[3] His belief was supported by Judge Kavanaugh, who observed at oral argument that a lawyer may wish to work for a "local U.S. Attorney's Office . . . [at] lower pay" because he "think[s] it'll help [his] chances of being a judge[.]" Oral Argument Tr. 27.

"bias[]" could affect Ortiz-Diaz's career development. *See* Maj. Op. 7–8. But, in my view, they cherry-pick the factual record to reach this conclusion. For example, they reach back twelve years to recount that McCarty temporarily (and involuntarily) transferred Ortiz-Diaz and another minority investigator to Mississippi in the wake of Hurricane Katrina. *Id.* at 3. But my colleagues ignore the fact that, four years later and within a year of allegedly becoming actionably biased, McCarty *approved* Ortiz-Diaz's promotion to senior special agent. They also ignore that McCarty worked to find Ortiz-Diaz a different comparably attractive job after awarding the New York ASAC position to another employee—who, again, was Hispanic. Likewise, my colleagues conclude that keeping Ortiz-Diaz under McCarty's supervision amounts to an adverse employment action. *See* Maj. Op. 8. But they overlook the fact that, as the district court noted, *see Ortiz-Diaz v. U.S. Dep't of Hous. & Urban Dev.*, 75 F. Supp. 3d 561, 565–66 (D.D.C. 2014), transferring Ortiz-Diaz to Albany or Hartford may itself have constituted an adverse employment action because it could entail a pay cut.

## C.

My colleagues' true qualm, I take it, is with our lateral transfer precedent. As Judge Kavanaugh recognizes, that precedent teaches that denials of lateral transfers generally do not support a Title VII discrimination claim. *See Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003). Today, we narrow that precedent on facts whose discriminatory bent is, at most, slight. As I have recounted, McCarty's alleged bias was hardly self-evident.[4] And in our adversarial system, facts

---

[4] To establish that prejudice, my colleagues rely largely on Ortiz-Diaz's sworn declaration. Granted, "there is no rule of law that the testimony of a discrimination plaintiff, standing alone, can *never* make out a case of discrimination that could withstand a summary

matter. *See, e.g.*, *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983). I would wait for a claim with more "objectively tangible harm." *Ginger v. District of Columbia*, 527 F.3d 1340, 1343 (D.C. Cir. 2008) (internal quotation marks omitted).[5]

---

judgment motion." *Johnson v. Perez*, 823 F.3d 701, 710 (D.C. Cir. 2016) (emphasis added) (internal quotation marks omitted). But the law surrounding its sufficiency at summary judgment is hardly as clear as they suggest. *See, e.g.*, *Holcomb v. Powell*, 433 F.3d 889, 899 (D.C. Cir. 2006) (rejecting "purely conclusory" allegations of discriminatory animus at summary judgment); *Burke v. Gould*, 286 F.3d 513, 520 (D.C. Cir. 2002) ("[B]are allegations of discrimination are insufficient to defeat a properly supported motion for summary judgment.").

[5] At oral argument Ortiz-Diaz's counsel posed a disturbing hypothetical. She claimed that, if we were to accept HUD's argument, we would have to affirm dismissal of a suit challenging an employer's affixing a "whites-only" sign to a water cooler because "not a penny is lost by any worker . . . [,] no one lost supervisory duties . . . [and it is] not in any way related to the actual workplace." Oral Argument Tr. 4. Although such action could, in my view, constitute a "discriminatorily hostile or abusive environment . . . sufficiently severe or pervasive" to sustain a hostile work environment claim under Title VII, *Harris v. Forklift Sys, Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted), it has no relevance to our "materially adverse action" precedent.

ROGERS, *Circuit Judge*, concurring: In returning this case to the district court, the three judges originally assigned to hear this appeal have, upon reconsideration, concluded that our Title VII precedent does not bar Ortiz-Diaz from proceeding to trial on his claims. For the reasons set forth in my dissent from the now-vacated opinion, *Ortiz-Diaz v. United States Dep't of Hous. and Urban Dev.*, 831 F.3d 488, 494–500 (D.C. Cir. 2016) (Rogers, J., dissenting), I welcome this result.[1]

Perhaps our reconsideration will serve as a shot across the bow that courts in this Circuit must adhere to the summary judgment standard and not prematurely reject evidence that a jury could reasonably credit. The ink that has been spilled over the course of this appeal, however, does not augur favorably for that result. Our precedent, and the record in this case, have been so finely parsed that one can only marvel at Ortiz-Diaz's escape

---

[1] Because Ortiz-Diaz proffered sufficient evidence of harm to his career prospects to survive summary judgment, the court had no need to address whether his inability to reunite with his wife in Albany could have also constituted a materially adverse employment consequence. Suffice it to note that the court has recognized suffering personal disappointment does not necessarily place a plaintiff's claim beyond the scope of Title VII. Severe effects upon the employee's personal life — such as schedule changes that affect sleep schedules or interfere with the plaintiff's education — "can render an employment action 'adverse' even if the employee's responsibilities and wages are left unchanged." *Ginger v. Dist. of Columbia*, 527 F.3d 1340, 1344 (D.C. Cir. 2008) (quoting *Freedman v. MCI Telecomms. Corp.*, 255 F.3d 840, 844 (D.C. Cir. 2001)); *see Keeton v. Flying J, Inc.*, 429 F.3d 259, 265–66 (6th Cir. 2005). Again, the operative question is whether a reasonable factfinder, considering Ortiz-Diaz's particular circumstances, would agree with him that the transfer denial created material adversity, *i.e.*, that the inability to relocate nearer to his wife constitutes an "objectively tangible" harm. *Ginger*, 527 F.3d at 1344.

from our otherwise stifling materiality standard under precedent that two judges initially concluded barred him from a judicial remedy. *Ortiz-Diaz*, 831 F.3d at 491–93 & n.7; *id.* at 494 (Kavanaugh, J., concurring); *see Ortiz-Diaz v. United States Dep't of Hous. and Urban Dev.*, 75 F. Supp. 3d 561, 568 (D.D.C. 2014). I fear that the next plaintiff, alleging a similar wrong, may not be as fortunate.

Therefore, it remains long past time for the *en banc* court to join its sister circuits to make clear that transfers denied because of race, color, religion, sex, or national origin are barred under Title VII, *see* Concurring Op. 1 (Kavanaugh, J.), and that any action by an employer to deny an employment benefit on such grounds is an adverse employment action under Title VII.

KAVANAUGH, *Circuit Judge*, concurring: Our precedents hold that discriminatory transfers (and discriminatory denials of transfers) are ordinarily not actionable under Title VII. *See Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003); *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999). The majority opinion narrows those precedents and holds that discriminatory transfers are sometimes actionable, including under the circumstances alleged in this case. I am comfortable with that narrowing of our precedents, and I therefore join the majority opinion.

That said, uncertainty will remain about the line separating transfers actionable under Title VII from those that are not actionable. In my view, the en banc Court at some point should go further and definitively establish the following clear principle: All discriminatory transfers (and discriminatory denials of requested transfers) are actionable under Title VII. As I see it, transferring an employee because of the employee's race (or denying an employee's requested transfer because of the employee's race) plainly constitutes discrimination with respect to "compensation, terms, conditions, or privileges of employment" in violation of Title VII. 42 U.S.C. § 2000e-2(a). I look forward to a future case where our Court says as much.