# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 24, 2023          Decided July 25, 2023
                                   Reissued August 10, 2023

No. 21-5097

LAURA J. RAMOS,
APPELLANT

v.

MERRICK B. GARLAND, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE UNITED STATES,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-00328)

———

*David E. Kouba* argued the cause for appellant. With him on the briefs was *Maura McGonigle.*

*Sean M. Tepe*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *R. Craig Lawrence* and *Jane M. Lyons*, Assistant U.S. Attorneys.

Before: SRINIVASAN, *Chief Judge*, WILKINS and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*:   Laura J. Ramos filed this Title VII action against her employer, the Federal Bureau of Investigation ("FBI" or the "Bureau") for allegedly taking retaliatory actions against her after she reported discrimination to the Bureau's Equal Employment Office ("EEO").   The District Court granted summary judgment in favor of the FBI on several of Ramos's allegations, finding that the FBI's actions were not materially adverse in violation of Title VII's antiretaliation provision.   The District Court also denied Ramos's motion for leave to amend her complaint to add new allegations of retaliation.   Ramos appealed.

## I.

We review the grant of summary judgment against Ramos *de novo*.   *Czekalski v. Peters*, 475 F.3d 360, 362–63 (D.C. Cir. 2007).   In the course of our review, we construe the facts in the light most favorable to Ramos and give her the benefit of all reasonable inferences.   *Id.* at 363.   With that framework, we summarize the relevant facts as follows.

## A.

Laura J. Ramos, a Hispanic woman, began her employment with the Federal Bureau of Investigation in 2003. In January 2010, Ramos was assigned to the Supervisory Special Agent ("SSA") position in Unit 1D of the FBI's Counterintelligence Division.   In April 2011, Ramos began noticing that her direct supervisor treated Ramos differently from other employees, and in May 2011, she began the process of informing the EEO about this issue.   She alleges three different instances of mistreatment in retaliation for this conduct.

**1.**

First, Ramos alleges she was denied an opportunity to transfer to a new unit due to her protected activity. In May 2011, Ramos informally contacted the EEO to divulge what she perceived to be discrimination from her direct supervisor, on the basis of her race. Through counseling, the EEO informed Ramos that the supervisors in her chain of command would meet with her to discuss options of possible reassignment.

In an effort to resolve her informal EEO complaint, Ramos requested that Edward Finnegan, the Assistant Section Chief of the Eurasian Section of the FBI's Counterintelligence Division, and Douglas Lindquist, the Section Chief of the Eurasian Section of the FBI's Counterintelligence Division, transfer her outside of Unit 1D. Ramos imparted that she would prefer a transfer outside of the Eurasian Section completely but would accept a temporary duty assignment.

On August 31, 2011, after failed attempts to transfer Ramos, she filed a formal complaint with the EEO.

On the same day, apparently unaware that Ramos had filed a formal complaint, Finnegan emailed Ramos with an opportunity to permanently reassign her to Unit 1B, the section he and Lindquist supervised within the Eurasian unit. In response to Ramos's request for a temporary assignment, Finnegan relayed that he did not think a temporary assignment was going to be possible instead of a permanent transfer (after several attempts to secure her reassignment outside of the Eurasian Section), but if she accepted the permanent transfer to Unit 1B they could move on the reassignment immediately. On September 5, 2011, Finnegan sent another email reiterating that the permanent transfer to Unit 1B was

available and that "the option of a [temporary] out of section [assignment] [would not] provide a practical solution" because the Section could not "spare the resources." J.A. 319. Ramos responded to Finnegan's email offering reassignment to Unit 1B by asking to discuss the option further in the coming days.

On September 9, 2011, Ramos emailed Finnegan noting that she understood that the Eurasian Section would not allow for her temporary assignment outside of the section or division, but "as an interim measure," she would accept the opportunity to transfer to Unit 1B. J.A. 320. Two hours later, Finnegan emailed Ramos noting that he had been "notified that the EEO matter [had] now been made formal and that the next step [was] mediation." *Id.* For this reason, Finnegan explained that "the most appropriate course of action now is to allow [the EEO] process to determine" where Ramos would be transferred and under what circumstances and that he did not "want any continued direct action on [his] part to be construed as interfering with the mediation process." *Id.*

**2.**

Second, Ramos contends the FBI retaliated by instating someone to replace her in a leadership position following her return from medical leave. From 2010 through 2014, Ramos intermittently served as Program Manager for the FBI's Double Agent Operations Program. During that time, Ramos also served as the Program Manager for CENTCOM, the Extraterritorial Program, the former Soviet Republics, and Non-Establishment Offices "at minimum."

Ramos took medical leave in late 2012 through 2013. While Ramos was on medical leave, Steven Jett, Acting Unit Chief, covered for Ramos in managing the Double Agent Program. While Ramos was out on leave, Jett reached out to her to convey that he was thinking about contacting the Washington Field office to ask for someone to cover the

program as a temporary 90-day assignment. However, Jett also told Ramos that the Washington Field office might "say no" to letting an agent do a temporary detail, S.J.A. 839—40, so when he heard that Supervisory Special Agent Anthony Wagoner became "eligible for retirement" and was looking for a transfer for "7 to 8 months," Jett hired him. S.J.A. 680. Jett testified that he viewed Wagoner as a temporary transfer and that Wagoner was brought in to give Ramos "a break" while she was on medical leave. *Id.* at 409. Jett noted that he "didn't want to keep harassing her while she was on leave with work." *Id.* at 409–10.

Ramos returned from her medical leave in January 2013 and resumed managing the Double Agent Program. On March 28, 2013, Jett emailed the Double Agent Program's contacts within the FBI, copying Ramos, that Wagoner would be Program Manager and Ramos would be the Backup Program Manager for the Double Agent Program. Ramos responded to this email "upset" by the replacement. J.A. 410. Jett noted that he was "surprised" by Ramos's reaction to the reassignment because he thought he was doing her a favor. *Id.* at 414. He was also surprised since he had told her on multiple occasions that the reassignment was temporary and that when Wagoner retired it would be Ramos's program again.

On May 31, 2013, Wagoner retired and Ramos was reinstated as Program Manager of the Double Agent Program.

**3.**

Third, Ramos states that after returning from medical leave, the FBI refused to grant her requests to be transferred to different offices. Ramos requested to transfer outside of Unit 1D on three separate occasions in 2013 and 2014.

The first occasion Ramos requested a transfer was in October 2013 when the International Operations Division ("IOD") of the Bureau announced that it was seeking an agent to join its Belgium office as a transfer. Ramos volunteered for this position, along with others, including Agent Ben Larson. The names of all the agents in the Eurasian Section volunteering for this position, including Ramos, were submitted up their chain of command. The Counterintelligence Division Deputy Assistant, Debra Smith, asked Brian Brooks (who had replaced Lindquist as the Section Chief of the Eurasian Section) to narrow down the list of candidates from the Eurasian Section. The next day, Smith indicated in an email to another section that she had three finalists: Larson from the Eurasian Section and two candidates from other sections. Those three candidates were ranked by their enter on duty ("EOD") date, or the first day that the agent began school at Quantico. The Bureau often used this ranking system (choosing the agent with the most seniority) to decide who gets the transfer. Following that system, the Bureau chose Agent Larson for the transfer because his EOD date preceded the other two finalists' dates.

The second and third occasions that Ramos requested a transfer were in April and May of 2014. In April 2014, Ramos responded to a job posting for a critical needs transfer to the Boston Field Office, and in May 2014 Ramos responded to a job posting for a voluntary rotational transfer to the New York Field Office. Ramos was denied both transfers because of her rating as "Minimally Successful" in her 2013 Performance Appraisal Review ("PAR"). When Ramos inquired about these denials, the Bureau cited a policy explaining that an agent must have at least a "Successful" PAR rating to be eligible to transfer.

**B.**

This case was pending in the District Court for seven years.  Ramos first filed the action on March 13, 2013, alleging that the FBI discriminated against her based on race (Count I), subjected her to a hostile work environment (Count II), and retaliated against her for filing an administrative complaint reporting negative treatment (Count III).  On June 20, 2013, the FBI moved to dismiss both the racial discrimination and hostile work environment claims.  On March 21, 2014, the District Court granted the FBI's motion to dismiss the hostile work environment claim but denied its motion as to Ramos's racial discrimination and retaliation claims.

On March 10, 2014, shortly before the court ruled on the FBI's motion to dismiss, Ramos sought to file a motion for leave to supplement the complaint—adding several new claims to her case.  Ramos contended that additional incidents of unlawful retaliation took place after the filing of the initial complaint, such as the Bureau rejecting Ramos's request for medical leave without pay under the Family Medical Leave Act, delaying Ramos's reauthorization to carry her firearm, rating her "Minimally Successful" in her 2013 performance review, and significantly decreasing her supervisory responsibilities.   The District Court denied the motion, however, finding that the motion was not ripe for consideration because Ramos had not separately exhausted her administrative remedies for those allegations before bringing the lawsuit, which is required by Title VII.  *See* 42 U.S.C. § 2000e-5(f)(1); *see also Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) ("Title VII requires that a person complaining of a violation file an administrative charge with the EEOC and allow the agency time to act on the charge.").

The FBI moved for judgment on the pleadings on December 10, 2014, which the District Court granted in part and denied in part.  The District Court granted the FBI's

motion on the racial discrimination claim because Ramos had not "plausibly alleged that she was subjected to an adverse employment action." *Ramos v. Lynch*, No. 1:13-CV-328-ABJ, 2015 WL 11303199, at \*5 (D.D.C. July 7, 2015). The court denied the FBI's motion on the retaliation claim, however, "insofar as it [was] based on allegations concerning the September 2011 rescission of the offer to transfer and the November 2011 performance evaluation" and not any other allegations of retaliation. *Id.* at \*10.

On August 25, 2015, Ramos moved to file an amended complaint "to address [] continued and escalating acts of retaliation" by the FBI. J.A. 105–06. The District Court granted Ramos's motion to amend her complaint on November 10, 2015, which claimed that she was stripped of her supervisory roles, denied various transfers, and was constructively forced to withdraw from a particular program.

On February 2, 2016, the FBI moved to dismiss the amended complaint in part, or in the alternative, for summary judgment in part. The District Court granted the FBI's motion in part and denied it in part, finding that Ramos's rescinded transfer claims had merit but her claims regarding her lower ratings on the 2011 PAR and her forced withdrawal from the Executive Development Service Program (or constructive demotion) failed. Ramos filed a second amended complaint on March 14, 2017, in accordance with the Court's decision.

Then on May 15, 2018, Ramos moved to file a third amended complaint seeking to add new allegations of retaliation. Ramos alleged that in 2016, the FBI launched an internal investigation into whether she falsified a bureau accident report in 2015. Upon completion of the investigation, the FBI placed Ramos on indefinite suspension and non-pay status, revoked her Top Secret Security clearance, and opposed her receipt of unemployment benefits. The FBI opposed the

motion, arguing that Ramos must separately administratively exhaust her new allegations. The District Court agreed.

On January 31, 2020, Ramos renewed her motion for leave to file a third amended complaint. In response, the FBI moved for summary judgment. Ramos opposed the FBI's motion. On August 11, 2020, the District Court denied Ramos's motion for leave to file a third amended complaint. The court found that adding some of Ramos's new allegations of retaliation would be futile because they failed to allege materially adverse actions. And it determined that adding others to an already seven yearlong litigation where the court already twice before granted leave to amend, and discovery for the second amended complaint had already closed, would unduly delay trial and create prejudice for the government. Additionally, the court granted the FBI's motion for summary judgment on all original claims, noting that Ramos did not proffer sufficient evidence that any of the alleged acts were "materially adverse."

Ramos timely appealed.

## II.

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination against "any individual" based on that individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). A separate provision of the Act, the antiretaliation provision, forbids an employer from "discriminat[ing] against" an employee or job applicant because that individual "opposed any practice" that is unlawful under Title VII or because that individual "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. *Id.* at § 2000e–3(a).

In *Burlington Northern and Santa Fe Railway Co. v. White*, the Supreme Court addressed the purpose of the

antiretaliation provision. 548 U.S. 53, 63 (2006). The Court explained that the antiretaliation provision's primary objective is to "seek[] a workplace where individuals are not discriminated against" for their race, ethnicity, religion, or gender status. *Id.* It "seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Id.* But the antiretaliation provision does not protect an individual from "all retaliation, but from retaliation that produces an injury or harm." *Id.* at 67. Specifically, the provision protects an employee from an employer's "materially adverse action," meaning an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68.

Summary judgment is not appropriate unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Thus, the question before this Court is whether Ramos provided sufficient evidence to create a genuine dispute that the Bureau's actions were materially adverse to her and taken with a retaliatory motive. *See McGrath v. Clinton*, 666 F.3d 1377, 1380 & n.3 (D.C. Cir. 2012).

### A.

The Bureau argues that Finnegan's decision to withdraw his offer for Ramos to transfer to Unit 1B after he learned that she launched a formal EEO complaint was not a materially adverse action taken with retaliatory motive toward her. The Bureau contends that Finnegan's action in withdrawing himself from the process of helping find transfer opportunities for Ramos and rescinding the offer to transfer her to Unit 1B was not adverse because his actions were merely an attempt to not interfere with the EEO process. Additionally, the Bureau

highlights that Finnegan did not understand Ramos's email to be an acceptance of the offer to transfer to Unit 1B because he offered Ramos a permanent transfer and she accepted on a temporary basis.

Before the District Court, Ramos presented evidence that she had accepted the transfer offer to Unit 1B in an email to Finnegan on September 9, 2011. Two hours later, Finnegan responded to Ramos's acceptance by withdrawing the transfer offer because Ramos formalized her EEO complaint. Irrespective of whether Finnegan understood her to not be accepting his offer as a permanent transfer, there is sufficient evidence for a reasonable jury to conclude that Ramos accepted the offer and that Finnegan's rescission had retaliatory motive because it was the direct result of Ramos's formal EEO complaint. There is also sufficient evidence for a reasonable juror to conclude that Finnegan ceased searching for other transfer opportunities for Ramos because of the same. Additionally, Ramos presented evidence that the transfer to Unit 1B would have broadened her "career opportunities[,] [] enhance[d her] skill sets as an agent," and provided her with a better and more positive work environment. *Cf. Ortiz-Diaz v. HUD*, 867 F.3d 70, 74—77 (D.C. Cir. 2017) (concluding in the discrimination context that similar evidence created a genuine issue of material fact as to material adverseness).

Because Finnegan's actions were the direct result of Ramos's EEO complaint and Ramos provided sufficient evidence that the action was materially adverse to her, we find that there is a genuine dispute as to whether Finnegan's rescission of his offer to transfer Ramos to Unit 1B constituted a "materially adverse action" taken with retaliatory motive. Thus, the District Court erred in granting summary judgment on this claim. *See Forman v. Small*, 271 F.3d 285, 299–300 (D.C. Cir. 2001) (reversing summary judgment on retaliation claim where the employer's own statements

indicated that his adverse action of failing to forward the employee's complaint to the appropriate party was in response to the employee's protected activity).

**B.**

Ramos contends that the Bureau's reassignment of her duties from Program Manager to "Backup Program Manager" of the Double Agent Operations Program was materially adverse to her and the result of retaliatory intent.

However, the Bureau provided a legitimate, nonretaliatory reason for Jett's decision to make Ramos Backup Program Manager: concern for her well-being when she returned to work following medical leave and was still recovering from injuries. Jett noted that the motive in looking to bring someone in was to give Ramos "a break" while she was on medical leave so that Jett would not "keep harassing her while she was on leave with work." J.A. 409–10. Then, when Jett announced the reassignment after Ramos had returned from medical leave, he explained that he did not want to burden Ramos with a heavy workload as she was recovering from her injuries. He testified he was "surprised" that Ramos was upset with the reassignment because he thought he was doing her a favor. He also noted that he told her on multiple occasions that the reassignment was temporary and that when Wagoner retired in "7 to 8 months" that it would be Ramos's program again. S.J.A. 680. About two months after the reassignment, Wagoner retired and Ramos was reinstated as Program Manager of the Double Agent Program.

Because Ramos did not provide sufficient evidence for a reasonable jury to conclude that Jett's actions reassigning her to Backup Program Manager were retaliatory, we affirm the District Court's grant of summary judgment on this claim.

## C.

Ramos also contends that the Bureau acted in retaliation by denying several transfer requests from 2013 to 2014, including a request to IOD and to the Boston and New York Field Offices.

Ramos points to her denied IOD transfer request as a materially adverse action that the Bureau took based on her protected activities. She argues that the transfer was materially adverse because, without it, she was forced to remain at headquarters longer than most agents, where she obtained more limited and less desirable experiences. But Ramos presented no evidence of that effect, and the evidence does not indicate that she experienced more than "trivial harms" as a result of the denial. *White*, 548 U.S. at 68. In this context, no reasonable jury could conclude that the denial was a materially adverse action.

Ramos's claims regarding the Boston and New York transfers fail because no reasonable jury could conclude that the denials were based on retaliatory motive. In her exchange with a representative in the Transfer Unit, Ramos learned that she was not chosen for the transfers because an agent must have at least a "Successful" PAR rating (per FBI policy) to become eligible to transfer. At that time, Ramos had a "Minimally Successful" PAR rating and was thus not eligible. Ramos did not provide any evidence that any members from the Transfer Unit had the ability to override the policy or that the application of the policy was pretextual.

Thus, the District Court did not err in granting summary judgment in favor of the Bureau on its denial of the transfers to IOD or to the Boston and New York Field Offices.

## III.

This Court reviews a district court's denial of leave to amend the Complaint for abuse of discretion, except for denials based on futility, which we review *de novo*. *Xia v. Tillerson*, 865 F.3d 643, 649 (D.C. Cir. 2017).

Ramos contends that the District Court erred when denying her motion for leave to file a third amended complaint to include new allegations of retaliation, including that the FBI gave her a minimally successful PAR rating, confiscated her FBI-issued firearm, excluded her from meetings, removed her authority to carry an FBI-issued firearm, and refused to allow Ramos to take leave without pay for surgery.

But in Ramos's opening brief, she fails to make any arguments addressing how the District Court abused its discretion by concluding that granting the motion would cause undue delay or prejudice to the FBI. Ramos also offers only skeletal and inadequately developed arguments that the District Court erred in concluding that it would have been futile to add allegations about Ramos's exclusion from meetings. *See Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) ("A party forfeits an argument by failing to raise it in his opening brief."); *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019) (holding that a party forfeits any argument when it only mentions it "in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones"). Accordingly, we find that the District Court did not abuse its discretion by denying Ramos's motion for leave to file a third amended complaint.

\* \* \*

For the foregoing reasons, we reverse the District Court's grant of summary judgment with regard to the 2011 rescission of the offer to transfer to Unit 1B, but we affirm on all other grounds.

*So ordered.*